**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JAMES D. YOUNG,** | : | Case No. 1:10CV483 |
| | : | |
| Plaintiff, | : | Judge Michael R. Barrett |
| | : | |
| vs. | : | |
| | : | |
| **GANNETT SATELLITE** | : | **DEFENDANT'S MOTION** |
| **INFORMATION NETWORK, INC,** | : | **FOR SUMMARY JUDGMENT** |
| | : | |
| Defendant. | : | |

Pursuant to Rule 56(C) of the Federal Rules of Civil Procedure, Defendant Gannett Satellite Information Network, Inc. moves the Court for Summary Judgment on the defamation claim asserted by Plaintiff James D. Young. The controverted news article is protected by both statutory privilege and well-established common law. As no facts are in dispute, Defendant is entitled to Summary Judgment as a matter of law.

A Memorandum In Support of Defendant's Motion is attached.

Respectfully submitted,

*Of Counsel:*

　/s/ John C. Greiner　　　　　　　
**John C. Greiner** (0005551)
**Steven P. Goodin** (0071713)
*Attorneys for The Cincinnati Enquirer*

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45202-3157
Phone: (513) 621-6464
Fax: (513) 651-3836

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45202-3157
Direct: (513) 629-2734
Fax: (513) 651-3836
E-Mail: jgreiner@graydon.com
　　　　sgoodin@graydon.com

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**I.     INTRODUCTION**.................................................................................................1

*The controverted article is a fair and impartial report based upon public documents. Accordingly, it is protected by both statutory privilege and common law First Amendment protections.*

**II.    UNDISPUTED OPERATIVE FACTS**..........................................................3

*Discovery has been completed, and none of the facts relating to Defendant's news gathering and reporting process are contested. The case is therefore ripe for summary judgment consideration.*

**III.   SUMMARY JUDGMENT STANDARD** ..................................................7

*Summary judgment is particularly appropriate when a plaintiff's claims impact the First Amendment and could potentially limit the public's right to know of the activities of public servants.*

<u>**Authorities Cited:**</u>
Fed. R. Civ. P. 56(C)..............................................................................................7
*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ...........................................7
*Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 458-459 (6th Cir. 2004).........7
*Dupler v. Mansfield Journal Co., Inc.* (1980), 64 Ohio St.2d 116, 413 N.E.2d 1187...................8
*Vail v. The Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182 ................8

**IV.   LAW AND ARGUMENT**.......................................................................8

      **A.    The Ohio Statutory "Fair Report" Privilege Requires The Dismissal Of Young's Defamation Claim As A Matter Of Law.** ......................................9

      *The Ohio Revised Code provides express protection for fair and impartial reports on judicial proceedings. The news article was primarily based upon such records. Accordingly, the privilege applies and defeats the defamation claim.*

<u>**Authorities Cited:**</u>
FRE 501 ...................................................................................................................9
Ohio Revised Code 2317.05 ....................................................................................9
Ohio Revised Code 2317.04 ...............................................................................9, 10
*Dinkel v. Lincoln Publishing, Inc.* (1994), 93 Ohio App.3d 344, 347 638 N.E.2d 611, 613-614 ...................................................................................................................9
*Hahn v. Kotten* (1975) 43 Ohio St.2d 237, 243-244, 371 N.E.2d 713 ...............10
*Oweida v. Tribune-Review Pub. Co.*, 410 Pa.Super 112, 599 A.2d 230 (1991), appeal denied, 529 Pa. 670, 605 A.2d 334 (1992) ................................................10
*First Lehigh Bank v. Cowen*, 700 A.2d 498, 503, 26 Media L. Rep. 1075.........11
*Williams v. VCAU-TV*, 555 F.Supp. 198, 202 (E.D. Pa. 1953)..........................11
*Lawton v. Georgia Television Co.*, 216 Ga. App. 768, 456 S.E.2d 274, 277 (Ga. App. 1995) .................................................................................................................11

i

*Medico v. Time, Inc.*, 643 F.2d 134 (3rd Cir. 1981), cert. denied, 454 U.S. 836, 102
    S.Ct. 139, 70 L.Ed. 2d 116 (1981) ..................................................................10
Eldredge, *The Law of Defamation*, section 79(b)(1) at 427, 430 (1978) ........................10
*Oney v. Allen* (1988), 39 Ohio St.3d 103, 529 N.E.2d 471 ...........................................11
*Time v. Pape*, 401 U.S. 279 (1971) ..................................................................................11
*New York Times v. Sullivan*, 376 U.S. 254, 279 (1964) ..................................................12
*New York Times v. Sullivan*, 376 U.S. at 271-272 ........................................................12

> **B.**     **Young's Claim Must Be Dismissed Because The Controverted News
>     Story Is Substantially True.** ......................................................................13
>     *The controverted news article accurately conveys the "gist" of the original
>     controversy which engulfed Plaintiff's law enforcement career.
>     Accordingly, it is protected by the First Amendment and interpretative
>     case law.*

**Authorities Cited:**

Ohio Revised Code 2739.02 ..............................................................................................13
*Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 445, 662
    N.E.2d 1074, 1083 ......................................................................................................13
*Sethi v. WFMJ-TV* (1999), 134 Ohio App. 3d 796, 808, 732 N.E. 2d 451 ...................13
*Masson v. New York Magazine, Inc.* 501 U.S. 490 (1991) ............................................13
*Behr v. Meredith Corp.* 414 N.W.2d 339, 342 (Iowa 1987) ........................................14
*Zerangue v. TSP Newspapers, Inc.* 814 F.2d 1066, 1074 (5th Cir. 1987) .....................14
*Fendler v. Phoenix Newspapers, Inc.* 130 Ariz. 475, 480, 636 P.2d 1257, 1262 (Ct.
    App. 1981) .................................................................................................................14
*Bill Partin Jewelry, Inc. v. Smith*, 467 So.2d 188, 189 (La. Ct. App. 1985) ...............14

> **C.**     **Young's Defamation Claim Fails Because The Story Is Subject To An
>     Alternate Innocent Construction.** ............................................................16
>     *The controverted news article can readily be interpreted in a non-
>     defamatory manner. Accordingly, the Court is bound to accept the non-
>     defamatory construction and dismiss Plaintiff's defamation claim as a
>     matter of law.*

**Authorities Cited:**

*Yeager v. Local Union,* 20 (1983), 6 Ohio St.3d 369, 372, 6 OBR 421, 423, 453
    N.E.2d 666, 669 .........................................................................................................16
*New Olde Village Jewelers v. Outlet Communications, Inc.* (6th Cir. 2000), 202 F.3d
    269, 2000 WL 64942 (unpublished) ..........................................................................16
*Scott v. News-Herald* (1986), 25 Ohio St.3d 243, 253, 25 OBR 302, 310, 496 N.E.2d
    699, 708 ......................................................................................................................16

**D.**     **Young's Defamation Claim Fails Because He Has Suffered, At Best, Incremental Harm To His Reputation As A Result Of The Controverted News Story.**.................................................................17

*Given the complete public record, the reference to Plaintiff could have been much more damaging to his personal and professional reputation. Accordingly, Plaintiff cannot state a claim for defamation based upon the less damaging final printed product.*

**Authorities Cited:**

*Ferreri v. The Plain Dealer Publishing Co.* (2001), 142 Ohio App.3d 629, 642-643, 756 N.E.2d 712 ...................................................................................................17

*Masson*, supra, at syllabus ......................................................................................17

*Frigo v. UAW Local 549*, 2005 Ohio App. LEXIS 3641 *9, 2005 Ohio 3981, 177 L.R.R.M. 3300 .....................................................................................................17

*Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1565, 1568 (D.C. Cir. 1984) .....................17

**E.**     **Young's Claim Is Barred Due To The Lack Of Actual Malice.** ......................18

*As a public official, Plaintiff must establish by clear and convincing evidence that the purportedly defamatory statement was made with actual malice. No such evidence has been proffered -- and Plaintiff has even admitted that he does not possess it.*

**Authorities Cited:**

*Scott v. News Herald* (1986), 25 Ohio St.3d 243, 496 N.E.2d 699, 704 ......................18

*New York Times Co.*, supra, at 279 .....................................................................18, 20

*Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609......................................18

*Harte-Hanks Communications, Inc. v. Connaughton* (1989), 491 U.S. 657, 688, 109 S.Ct. 2678...........................................................................................................18

*Garrison v. Louisiana* (1964), 379 U.S. 64, 74, 85 S.Ct. 209 ...............................18, 19

*St. Amant v. Thompson* (1968), 390 U.S. 727, 88 S.Ct. 1323....................................18

*Orr v. Argus-Press Co.* (6ᵗʰ Cir. 1978), 586 F.2d 1108, 1112 .....................................18

*Raymond v. Croll* (1925), 233 Mich. 268, 275-75, 206 N.W. 556, 558)....................18

*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710 .........................18

*Henry v. Pearson* (1965), 380 U.S. 356, 85 S.Ct. 992................................................18

*Soke v. Plain Dealer* (1994), 69 Ohio St.3d 395, 397, 632 N.E.2d 1282 ....................18

*Perez v. Scripps-Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 215, 520 N.E.2d 198 .........................................................................................................19

*Mueller v. Storer Communications*, 46 Ohio App.3d 57, 545 N.E.2d 1317 (1988) .....................19

**V.**     **CONCLUSION** ........................................................................................20

*Given the lack of contested facts, and the manifest statutory and common law authority contrary to Plaintiff's sole claim, summary judgment is appropriate at this stage in the litigation.*

<u>MEMORANDUM IN SUPPORT OF DEFENDANT'S</u>
<u>MOTION FOR SUMMARY JUDGMENT</u>

I.      <u>INTRODUCTION</u>

Plaintiff James D. Young ("Young"), a Miami Township (Ohio) Police Officer, was accused of raping a woman while on duty in 1997 – and was fired when an internal affairs report confirmed that accusation.

The editors and reporters of *The Miami-Milford Advertiser* ("*Advertiser*"), a newspaper published by Defendant Gannett Satellite Information Network, Inc. ("Gannett"), *could* have gone to press with precisely this statement. The voluminous public record of the case, including both internal affairs and criminal investigations, clearly establishes that undisputed fact.

Instead, Gannett merely noted, in the context of a 2010 news story about recent police misconduct, that Young was fired because "[he] had sex with a woman while on the job."[1]  This tamer rendition took into account the Clermont County Prosecutor's decision to forego indictment, as well as a subsequent arbitrator's report which described the relationship as inappropriate but consensual. Gannett further considered a common pleas court decision which affirmed the arbitrator's reduction of Young's termination to a suspension – while also explicitly decrying the underlying conduct.

After months of discovery, there is no dispute that the fleeting reference to Young was based upon a review of hundreds of pages of public documents by the *Advertiser* editor. The Miami Township Police Department internal affairs report (dubbed a "Professional Standards Investigation") provided a particular wealth of detail to the editor, including descriptions of the accuser's polygraph test results (she passed), the attempts to get Young to take a similar test (he

---

[1]      A full and complete copy of the *Advertiser* May 26, 2010 story, *Cop's Suspension Called Best Move For City*, is attached as Exhibit 2 to the deposition transcript of James D. Young ("Young Depo."). A certified copy of said transcript has been filed with the Clerk in accordance with S.D. Ohio Civ. R. 5.4 (b) and 7.2 (d) and (e).

never did), Young's sworn admissions that he visited the accuser's apartment at least a dozen times during duty hours and his own chief's conclusion that the accuser's allegations were factually "sustained."  That the article also notes Young's reinstatement, and references the arbitrator's report and related court decision, only underscores the breadth of her research.

Now, Young claims he was defamed by even this mild account of his termination and reinstatement. His argument essentially boils down to the following: No judicial tribunal ever issued an express finding that sexual relations occurred between the parties, thus any statement regarding the allegations must be couched in extensive qualifying language.  Young's claim, however, is nearly as outrageous as his own admitted conduct in 1997.

The controverted story is a fair and impartial report of a judicial proceeding and, as such, is expressly protected by applicable Ohio statutory privilege.  The assumption of consensual sex between Young and his accuser runs through all of the later public documents, including the arbitrator's report and the judge's decision.  Further, the United States Supreme Court has expressly held that lower courts need not entertain quibbles about the use or non-use of the word "alleged" in news stories based upon criminal cases and investigatory documents.  The story draws a well-supported conclusion from a vast public record and, as such, cannot be subject to *any* claim, much less one levied by a public official.

The article is also shielded by common law First Amendment protections.  The story correctly conveys the "gist" of its undisputed source material and is thus entitled to protection as a true or substantially true account of a public matter.  Additionally, the story is readily subject to an alternate innocent construction – namely, that it is an objective report of a controversy which does not endorse any particular version of the underlying facts.  And, given the inflammatory

nature of the original charges, the "incremental harm" doctrine renders Young's prospective damages a nullity; the full story, if printed, would have been much worse.

As a police officer, Young is indisputably a public figure.  As such, his defamation claim is subject to the heightened "actual malice" standard – in essence, he must prove that Gannett entertained grave doubts about the veracity of its story.  The sworn, unrebutted testimony of the newspaper editor, however, demonstrates the meticulous and malice-free process by which she confirmed the allegations through various public sources.  Even Young has admitted that he possess no direct or circumstantial evidence of actual malice on the part of Gannett or its employees.

There is no factual controversy for the Court to adjudicate here.  The record is utterly devoid of *any* evidence of actual malice.  The editor crafted her short passage in as dispassionate a manner as possible, totally deleting any reference to the rape allegation.  With Young, however, no good deed goes unpunished.[2]  He seeks to twist the well-established law of defamation into a "gotcha" game, begging the Court to parse phrases and tease out potentially defamatory meanings.  But, as a public official, he simply has no claim on these facts.

As Young's sole claim fails as a matter of law, his entire Complaint must be dismissed pursuant to Civil Rule 56.

## II.  UNDISPUTED OPERATIVE FACTS

In his Complaint – and throughout the discovery process – Young has attempted to manufacture a genuine issue of material fact regarding the sex act itself.  The accuser claims Young forced her to perform oral sex during one of his many admitted visits to her apartment in

---

[2]    This is not Young's first attempt to base a defamation action on the fall-out from the 1997 incident. He unsuccessfully brought such an action against Miami Township officials in 2000. *See* Young Depo. at 8.

1997.[3]  At the time, she presented a floor rug for forensic testing – and it is uncontested that the rug did not test positive for Young's DNA.[4]  He now argues that this lurid fact, coupled with the county prosecutor's predictable decision to forego indictment, creates a genuine factual controversy necessitating a trial.  That is, Young maintains that the finder of fact in this case must determine whether Young did in fact receive sexual favors, forced or unforced, in a Clermont County woman's apartment in 1997.

Whether Young actually engaged in sexual contact nearly fifteen years ago is not at issue in this litigation.  The real issue is whether Gannett employees maliciously misinterpreted the public record attendant to the 1997 incident. For the purpose of *this* inquiry, not a single fact is contested.

No one, including Young, can reasonably dispute that he was fired for raping a woman while on duty.  The fact that questions later emerged as to whether the accuser had consented to the activity – and that Young was reinstated largely as a result of those questions – is clearly reflected in the story itself.  Even Young appears to concede that the arbitrator who reinstated him focused on the credibility of the "force" allegation, and not on the issue of whether any sexual conduct had occurred.[5]

Thus, these tired and irrelevant he said/she said arguments have no bearing on the Court's ultimate analysis.  This case is a defamation claim waged by a public official.  The fact that the allegations against him generated a substantial public record is beyond dispute.  Unless he can produce evidence that Gannett employees knew these public records contained falsehoods, and published them anyway, he simply has no claim.

---

[3]    Young Depo. at  47.
[4]    Deposition of Theresa Herron ("Herron Depo.") at 58-59. A certified copy of said deposition transcript has been filed with the Clerk in accordance with S.D. Ohio Civ. R. 5.4 (b) and 7.2 (d) and (e).
[5]    Young Depo. at 65.

With this in mind, the facts are straightforward. In May, 2010, the *Advertiser* dedicated significant coverage to a scandal involving the Milford, Ohio mayor and a member of the town's police force.[6]  The mayor had resigned after admitting to a series of sexual encounters with the officer during his duty hours.[7]  The officer was suspended for his actions, but not fired.[8]

In the controverted news story, the *Advertiser* sought to address a public outcry regarding the perceived lightness of the officer's punishment. Young's termination – and subsequent reinstatement following arbitration – was cited as an explanatory example in this context.[9]  In the end, the overall story was about the legalities and politics of police personnel decisions, and the reference to Young was, by any measure, a fleeting one.

The exacting research methodology employed by *Advertiser* editor Theresa Herron is likewise uncontested.  Herron, a veteran journalist with 25 years of newspaper experience, authored and inserted the passage concerning Young on May 26, 2010.[10]  But she did so only after reviewing the 330-page public record of the Young case already in the newspaper's possession.[11]  These documents included the initial internal affairs investigation, replete with sworn statements and lengthy interviews, as well as the arbitrator's lengthy report and the common pleas court decision upholding it.[12]  Herron also reviewed various documents relating to the short-lived criminal complaint against Young, including a report referencing the accuser's

---

[6]  *See generally*, Young Depo., Exhibit 2.
[7]  *Id.*
[8]  *Id.*
[9]  *Id.*
[10]  Herron Depo. at 8. Herron also edits three other Gannett-owned weekly newspapers, including *The Community Journal Clermont, The Community Journal North and The Bethel Journal*.
[11]  Herron Depo. at 43-64. These documents were already in the possession of the newspaper staff due to its prior coverage of the earlier Young allegations. *See also* Young Depo. at 83-84 (his termination and the subsequent court battle had been covered by the newspaper "multiple times").
[12]  *Id.* The above-referenced collection of public documents concerning the Young investigations and subsequent arbitration/litigation is appended to the Young Depo. as Exhibit 1.

polygraph test.[13]  Per Herron's recollection, she read more than half of this collection of documents.[14]

The fact that she both possessed and reviewed these documents prior to publishing the story is uncontested.  She also readily admits that the records in her collection included the DNA test results.[15]  The public documents also included, however, a complete record of the Miami Township internal affairs report, including the chief's formal conclusion that the accuser's claims were "sustained."

Herron also specifically recalls reading the arbitrator's decision, which questioned the credibility of both parties and described their interactions as "a private relationship between two consenting adults."[16]  Although the arbitrator was not convinced of the rape allegation, he nonetheless levied a 60-day unpaid suspension based upon Young's conduct with the accuser. The arbitrator made a specific written finding that Young had committed "Unbecoming Conduct" due to his "involvement" with the woman, and found "Neglect of Duty" based upon Young's slow response to a radio call while visiting the accuser's apartment.[17] Additionally, Herron reviewed a Clermont County Common Pleas decision which adopted the arbitrator's report but explicitly refused to "condone … the conduct which has occurred." [18]

Before going to press, Herron also double-checked the Young reference with Miami Township Trustee Mary Wolf.[19]  As a longtime community activist and elected official, Wolf was thought to possess an institutional memory of the municipality's workings.[20]  Herron

---

[13]    *Id*. at 49.
[14]    *Id*. at 47.
[15]    *Id*. at 58-59.
[16]    *Id*. at 56; Young Depo., Exhibit 1, at YO0000265-66.
[17]    Young Depo, Exhibit 1, at YO0000267-68.
[18]    Herron Depo. at 38, 62-63; Young Depo, Exhibit 1, at YO0000329.
[19]    *Id*. at 34 -35.
[20]    *Id*.

summarized the proposed passage during a telephone conversation the evening of May 26, 2010; Wolf did not suggest any changes.[21]

Having performed excessive due diligence, Herron did what reporters do every day – she took a lengthy (and in places contradictory) public record and boiled it down to concise and accurate sentences. After taking into account the internal affairs finding and the polygraph results, as well as the clear assumption of both the arbitrator and the common pleas court that at least consensual sex had occurred, Herron fairly and impartially reported that Young was fired for having sex on the job[22] and was ultimately rehired after arbitration.

The record is also notably devoid any evidence that Young requested a retraction or sought to clarify the story, other than the *ex post facto* filing of this Complaint. Young further admits that he did not know Herron nor possesses any evidence of a grudge or animus on the part of any Gannett employee toward him.[23] He also acknowledges that the story never caused him to miss work or seek psychiatric treatment.[24]

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."[25] "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."[26] In opposing a motion for summary judgment, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and by

---

[21]   *Id.*
[22]   Herron has testified that she considered oral sex to be "sex" for the purposes of the controverted story. At this point, Young apparently no longer harbors any semantical argument about between the two terms. *See* Herron Depo. at 20.
[23]   Young Depo. at 70-75.
[24]   Young Depo. at 77-81.
[25]   Fed. R. Civ. P. 56(C).
[26]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[27]

Here, Young alleges that Gannett's publication is *per se* defamatory.[28]  When claims such as this one directly raise First Amendment concerns, consideration of summary judgment is "especially appropriate."[29]  Defamation cases are often particularly ripe for summary judgment consideration as the determination of whether words are defamatory is ultimately a question of law.[30]

## IV.  LAW AND ARGUMENT

The Court's inquiry is, like the operative facts, extraordinarily straightforward.  If the Court concludes that the Young reference in the controverted story is a fair and impartial report of a judicial proceeding, then the Ohio statutory "fair report" privilege applies.  Such a finding – which is well-supported by the ample record in this matter – would dispose of Young's defamation claim and thus his entire Complaint.

Yet even if the Court were to look beyond the statutory privilege, every other applicable strain of First Amendment jurisprudence also requires dismissal of this claim as a matter of law. The substantial truth of the story garners it constitutional protection, as does the fact that it is readily subject to an alternate innocent construction.  Given the underlying facts, the "incremental harm" doctrine renders the prospect of actionable damages untenable.  And the absence of even a scintilla of evidence of actual malice dooms Young's claim by any measure.

---

[27]  *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 458-459 (6th Cir. 2004) (quoting *Celotex Corp.*, 477 U.S. at 324).

[28]  *See* Complaint at 10.

[29]  *Dupler v. Mansfield Journal Co., Inc.* (1980), 64 Ohio St.2d 116, 413 N.E.2d 1187, paragraph two of the syllabus.

[30]  *Vail v. The Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182.

In the end, both state and federal law expressly protect this precise kind of reporting.  The public's right to follow the comings and goings of their public servants is nigh inviolable, and Young has provided no facts or legal theory which could conceivably overcome that right.

### A.    The Ohio Statutory "Fair Report" Privilege Requires The Dismissal Of Young's Defamation Claim As A Matter Of Law.

The Federal Rules of Evidence unambiguously provide for the application of state law privileges in matters in which "[s]tate law supplies the rule of decision."[31]  Accordingly, the "fair report" privilege set forth in Ohio Revised Code 2317.05 is wholly applicable to – and wholly dispositive of – Young's claims:

> The publication of a fair and impartial report of the return of any indictment, the issuing of any warrant, the arrest of any person accused of crime, or the filing of any affidavit, pleading or *other document* in any criminal or civil cause in any court of competent jurisdiction, or of *a fair and impartial report of the contents thereof, is privileged*, unless it is proved that the same was published maliciously, or that the defendant has refused or neglected to publish in the same manner in which the publication complaint of appeared a reasonable explanation or contradiction thereof by the plaintiff, or *that the publisher refused, upon request of the plaintiff, to publish the subsequent determination of such suit or action* … (emphasis added)[32]

Ohio courts have held that this statute can – and *should* – properly serve as the basis for summary judgment, especially when the complaint merely quibbles with secondary facts that do not alter the "gist" of the information presented.[33]  In fact, federal courts have held that "fair

---

[31]  *See* FRE 501 ("…in civil actions and proceedings, with respect to an element of a claim or defense to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.")

[32]  *See also* Ohio Revised Code 2317.04, which provides a similarly expansive privilege to media outlets covering the proceedings of any state or local legislative proceeding. To the extent that the Miami Township Board of Trustees ratified the Young personnel actions, and Gannett relied upon related reports, this privilege is also applicable.

[33]  *See, e.g.*, *Dinkel v. Lincoln Publishing, Inc.* (1994), 93 Ohio App.3d 344, 347 638 N.E.2d 611, 613-614("Plaintiff cannot defeat summary judgment by raising purported minor discrepancies between the news reports and the official information … Errors as to secondary facts are not actionable"); *see also First Lehigh Bank v. Cowen* (1997),  700 A.2d 498, 504, 25 Media L. Rep. 1075 (correct "gist" of story triggers "fair report" privilege and justifies summary judgment finding).

report" statutes do not require "verbatim" transcriptions of court proceedings, and that any review must allow "some reasonable liberality" in determining whether the report accurately conveys the "gist" of the proceedings.[34]  In light of this expansive privilege, Young's claim fails as a matter of law.[35]

The materials considered by the *Advertiser* editor certainly qualify for the privilege.  The reference to Young was based, in large part, upon a judicial decision and an incorporated arbitrator's report, both of which clearly fall within the protection of the statute.[36]  Further, the internal affairs reports and related documents were likewise incorporated into those documents and related proceedings – and would, in any event, qualify for their own separate protection under Ohio Revised Code 2317.04 (the Chief of Police is an employee of the Miami Township Board of Trustees).  Consequently, the privilege clearly covers these public documents.

Similarly, there is absolutely no evidence of malice on the part of any Gannett employee, much less the *Advertiser* editor.  Herron and Young did not know each other, and Young has proffered neither direct nor circumstantial evidence of any sort of agenda on the part of the Gannett employees.  Thus, evidence of the malice required to nullify this privilege is simply not in the record, and reasonably cannot be inferred from any of the extant facts.  If such evidence does indeed exist, Young certainly has failed to adduce it.[37]

Likewise, there is no evidence that Young was ever denied an opportunity to correct the alleged false impressions left by the story.  In fact, there is no evidence that he ever requested

---

[34]    *Edmiston v. Time, Inc.*, 257 F. Supp 22, 25-26 (S.D. N.Y. 1966).

[35]    Ohio also recognizes a common law qualified privilege that protects the publication of otherwise defamatory material in the interest of fulfilling a public or moral duty or obligation. *See Hahn v. Kotten* (1975) 43 Ohio St.2d 237, 243-244, 371 N.E.2d 713 (qualified privilege in the interest of public policy).

[36]    The clear national trend is for the broad application of state "fair report" statutes. *See, e.g., Oweida v. Tribune-Review Pub. Co.*, 410 Pa. Super 112, 599 A.2d 230(1991), *appeal denied*, 529 Pa. 670, 605 A.2d 334 (1992); *see also Medico v. Time, Inc.*, 643 F.2d 134 (3rd Cir. 1981), *cert. denied*, 454 U.S. 836, 102 S.Ct.139, 70 L.Ed. 2d 116 (1981); Eldredge, *The Law of Defamation*, section 79(b)(1) at 427, 430 (1978).

[37]    Note that, per the Court's Civil Rule 26(f) scheduling order, the mutual discovery cut-off was May 30, 2011.

any redress, aside from his pending claim for damages. The controverted story also expressly noted Young's ultimate reinstatement to the police force; that was, in fact, the very rationale for even recounting his sordid tale. As a result, Young cannot claim that the privilege does not apply because Gannett refused "to publish the subsequent determination of such suit or action" against him.

What remains, then, is the Court's determination of whether the report is "fair and impartial" within the meaning of the statute. The Ohio Supreme Court has interpreted this provision as requiring a showing that "the publication is a substantially accurate report of the public record."[38]

Courts have established that "[a] statement is substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced."[39] As noted above, the precise truth – that an internal affairs investigation confirmed a rape accusation against Young – is far worse than the report at issue.

The United States Supreme Court has considered an almost precisely identical scenario, and has provided express guidance for courts faced with similar facts.

In *Time v. Pape*,[40] a Chicago policeman brought a defamation action against *Time Magazine* for its story about a Department of Justice report on police brutality. The source material was a compendium of police misconduct vignettes compiled by DOJ staff.[41] The magazine cited an episode involving a raid conducted by Pape in its article, but relayed the facts without noting that the material had been solely provided by a former criminal defendant.[42] The

---

[38] *Oney v. Allen* (1988), 39 Ohio St.3d 103,529 N.E.2d 471.
[39] *First Lehigh Bank v. Cowen*, 700 A.2d 498, 503, 26 Media L. Rep. 1075, citing *Williams v. VCAU-TV*, 555 F.Supp. 198, 202 (E.D. Pa. 1953); see also *Lawton v. Georgia Television Co.*, 216 Ga. App. 768, 456 S.E.2d 274, 277 (Ga. App. 1995).
[40] 401 U.S. 279 (1971).
[41] *Id*. at 281.
[42] *Id.*

district court ultimately oversaw a farcical trial in which Pape was allowed to re-litigate the facts of the raid in order to determine whether the *Time* article was "true."[43]

The Supreme Court held that *Time* was entitled to judgment in its favor as a matter of law. It noted, *inter alia*, that news reports based upon convoluted and sometimes contradictory public documents should be held to a looser standard. Otherwise, fear of defamation claims would lead to "'self-censorship'' and "'would-be critics of official conduct may be deterred from voicing their criticism.'"[44] The *Pape* majority noted that "[t]hese considerations apply with even greater force … [when the complaint alleges] … the misrepresentation of the gist of a lengthy government document."[45] Noting that such documents are often "ambiguous," the Court concluded that "it is hard to imagine a test of 'truth' that would not put the publisher virtually at the mercy of the unguided discretion of a jury."[46]

In other words, the United States Supreme Court has acknowledged that lengthy government reports, including those documenting police investigations, require a certain amount of interpretation, extrapolation and analysis. Otherwise, the public's right to know about the activities of public servants would be horribly compromised. As the Supreme Court noted in *New York Times v. Sullivan*, "freedoms of expression" require "breathing space … to survive."[47]

The *Pape* holding is particularly instructive in this case. In *Pape*, government reports containing victim statements served as the subject of a news report about police misconduct. The plaintiff was not the focus of the article, but a demonstrative example. The gravamen of both Pape and Young's complaints concerns the lack of qualifying words like "alleged," and

---

[43]   *Id.* at 282.
[44]   *Id*. at 290 (*quoting New York Times v. Sullivan*, 376 U.S. 254, 279 (1964)).
[45]   *Id.*
[46]   *Id.*
[47]   376 U.S. at 271-272.

both plaintiffs essentially argue that media outlets should not be allowed to extract their own factual conclusions from public records.

Accordingly, the *Pape* holding strongly supports the application of a "fair report" privilege to the controverted story. By the *Pape* standard, the *Advertiser* report was "fair and impartial" and certainly "substantially accurate." Even assuming errors for the sake of argument, *Pape* provides that news reports based upon such documents should be afforded some deference due to the public service the reports provide.

The Court need go no further in its analysis – the news story is privileged in every respect pursuant to Ohio statute, and Young's claim therefore fails as a matter of law.

### B. Young's Claim Must Be Dismissed Because The Controverted News Story Is Substantially True.

In the event that the Court declines to apply the "fair report" privilege, it must be noted that additional common law protections likewise shield Gannett from suit in this case. The most prominent is grounded in the undisputable fact that the article is, at the very least, "substantially true."[48]

The United States Supreme Court has expressly held that "the common law of libel overlooks minor inaccuracies and focuses on substantial truth."[49] Accordingly, the Court's inquiry will be whether the "gist" or the "sting" of a story is true, the misstatement or even

---

[48]   In Ohio, truth is a complete defense to a defamation claim. Ohio Revised Code 2739.02 states: "In an action for a libel or a slander, the defendant may allege and prove the truth of the matter allegedly as defamatory. *Proof of the truth thereof shall be considered a complete defense.*"(emphasis added) *See* also *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 445, 662 N.E.2d 1074, 1083. Ohio courts have also recognized that "substantially true" statements defeat defamation claims. *See, e.g., Sethi v. WFMJ-TV* (1999), 134 Ohio App. 3d 796, 808, 732 N.E. 2d 451.

[49]   *Masson v. New Yorker Magazine, Inc.* 501 U.S. 490, 491 (1991).

deletion of some details notwithstanding.[50]  Traditionally, reviewing courts allow media outlets particular leeway in reporting the details of legal proceedings and criminal allegations.[51]  Thus, a claim that an individual was "doing four-to-five years in jail" when he was, in fact, free on appeal, has been deemed substantially true and non-defamatory.[52]  Even confusion about the precise nature of criminal allegations has been found to be inconsequential for purposes of a defamation analysis.[53]  The issue remains whether the media outlet correctly reported the general idea.

In her sworn deposition testimony, Herron gave an unrebutted account of her newsgathering process in regard to the controverted article.[54]  She noted that, according to the public documents in her possession, the relevant decision-making body – here, the Chief of Police acting in his capacity as an internal affairs investigator – had concluded that the accuser's original rape claim was "sustained," or factually-supported.[55]  She further noted that this finding served as the basis for Young's firing.  Additional documents revealed that the arbitrator[56] – and, implicitly, the common pleas court which adopted his decision – cast doubt on the rape allegation, but appeared to assume the couple had engaged in consensual sex.

The arbitrator's report supports Herron's interpretation in every particular.  The sustained "Unbecoming Conduct" finding was specifically based upon Young's "involvement" with the

---

[50]  For a detailed discussion of the "substantially true" standard and sample applications, see the Iowa Supreme Court decision *Behr v. Meredith Corp.*, 414 N.W.2d 339, 342 (Iowa 1987); *see also Lawton v. Georgia Television Company* (1995), 216 Ga. App. 768, 772, 456 S.E.2d 274 (story must convey overall false impression to constitute "defamatory editing").

[51]  *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1074 (5th Cir. 1987) ("[In such cases], the defendant reported the substance of criminal proceedings, but erred in the use of legal terminology … [I]f the defendant's story had been free of error, the plaintiff would have been exposed to the same amount of community opprobrium. Theft by writing bad checks 'stings' as no more than theft of washing machine …")

[52]  *Fendler v. Phoenix Newspapers, Inc.*, 130 Ariz. 475, 480, 636 P.2d1257, 1262 (Ct. App. 1981); *see also Read v. Phoenix Newspapers, Inc.* 169 Ariz. 353, 819 P.2d 939 (Ariz. Sup. Ct. 1991)( failure to identify precise criminal charge and correct sentence non-defamatory).

[53]  *Bill Partin Jewelry, Inc. v. Smiih*, 467 So.2d 188, 189 (La.Ct.App.1985).

[54]  Herron Depo. at 43-64.

[55]  Young Depo, Exhibit 1, at YO00005.

[56]  Young Depo, Exhibit 1, at YO0000248-268.

accuser. Likewise, the "Neglect of Duty" finding was premised upon Young's failure to answer a duty call due to his dalliance in the accuser's apartment. Even putting aside the lengthy transcribed interviews and polygraph information, the arbitrator's findings alone provide adequate basis for the conclusion that "Young had sex with a woman on the job."

Accordingly, the printed statement was a precisely – and certainly *substantially* – true account of public documents. Multiple sources were consulted. Further, Young indisputably *was* fired based upon the internal affairs investigation and the Chief's finding that Young forced a woman to perform a sex act – and that he had done so while on duty. Given this finding, and the subsequent arbitrator's report sustaining the allegations in part, it would have been inaccurate to characterize the basis for Young's termination as a mere "allegation."

In the end, the judicial record supports the conclusion that Young, at the very least, engaged in consensual sex while on duty in 1997. And it indisputably supports the conclusion that he was fired based upon Miami Township's conclusion that some sort of sex had occurred. By any analysis, the reference to Young is supported by the judicial record and is either entirely true or substantially true.

Instead of proffering actual evidence of falsity, Young engages in an extended exercise in semantical hair-splitting. His sole proffered evidence consists of the ambiguous DNA test and his self-serving denials – neither of which stand as a legitimate, objective evidentiary proffer.[57] His Complaint must therefore be dismissed as a matter of law.

---

[57] The DNA evidence cited by Young is at best a red herring. Semen was recovered from the rug in the accuser's apartment – but it did not belong to Young. Thus, this is not a scenario in which the DNA sample definitively "clears" the defendant. *See* Herron Depo. at 58-59.

C.     **Young's Defamation Claim Fails Because The Story Is Subject To An Alternate Innocent Construction.**

The Ohio Supreme Court has long recognized the "innocent construction" rule as a complete defense to defamation.[58]  This rule requires that the reviewing court ascertain whether an alternative, non-defamatory ("innocent") interpretation of the article is possible, even if it is the not the more obvious one.[59]  Reviewing courts must consider the subject articles in their entirety to more fully appreciate the context of controverted statements.[60]

In other words, this Court must consider whether the article is open to an alternate interpretation which is non-defamatory.  And if the Court ascertains a second legitimate reading, it is bound to accept that interpretation as a matter of law and dispose of Plaintiff's claim.

Here, the controverted article easily could be read in two ways.  Plaintiff's preferred interpretation is that the article flatly states that he engaged in sex with a woman while on duty.  When the "sex" passage is read in context, however, it can also be interpreted as the allegation which served as a basis for his firing.  This alternate reading is completely consistent with the text.  Consider the prominent place accorded Young's reinstatement.  Also note the fact that the sex reference is placed immediately after the discussion of his firing.

A secondary reading, considering the totality of the article, could indeed cast doubt on the sex claim. The story reports that Young challenged his firing, and prevailed.  Clearly, this indicates that there might, at the very least, be two sides to the story.  As the reference to Young could be interpreted in a non-defamatory manner, his claim should be dismissed in accordance with applicable state law.

---

[58]    *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 372, 6 OBR 421, 423, 453 N.E.2d 666, 669.
[59]    *See, e.g., New Olde Village Jewelers v. Outlet Communications, Inc.* (6th Cir. 2000), 202 F.3d 269, 2000 WL 64942 (unpublished).
[60]    *Scott v. News-Herald* (1986), 25 Ohio St.3d 243, 253, 25 OBR 302, 310, 496 N.E.2d 699, 708.

16

**D.** **Young's Defamation Claim Fails Because He Has Suffered, At Best, Incremental Harm To His Reputation As A Result Of The Controverted News Story.**

Ohio also recognizes the "incremental harm" doctrine as a defense to defamation.[61] While this doctrine is not grounded in First Amendment concerns,[62] it does take into account the common sense problem of assessing reputational damage to an individual involved in a public scandal. In plain terms, the incremental harm doctrine allows courts to measure whether the harm allegedly caused by the challenged statement goes beyond the balance of the unchallenged material.[63]

Here, the application of the doctrine is sadly obvious. The *Advertiser* could have printed a detailed factual recitation of the entire public record of the Young saga, including the rape allegation. Dredging up a years-old criminal allegation, however, might have caused significant reputational harm. Instead, the editor opted for a less damaging and more nuanced interpretation which deleted the rape allegation. Thus, the incremental harm doctrine applies, and yet another common law doctrine guts Young's claims.

On a related note, some jurisdictions recognize a concept known as the "libel-proof plaintiff" doctrine.[64] In this formulation, some scandal-plagued plaintiffs have undergone so much public reputational damage that further harm is impossible to assess. A police officer accused of rape and rehired after a highly-publicized court battle would appear to fall within this category.[65] Under either standard, the claim fails as a matter of law.

---

[61] *See., e.g., Ferreri v. The Plain Dealer Publishing Co.* (2001), 142 Ohio App.3d 629, 642-643, 756 N.E.2d 712.

[62] *Masson, supra*, at 491.

[63] *Frigo v. UAW Local 549*, 2005 Ohio App. LEXIS 3641*9, 2005 Ohio 3981, 177 L.R.R.M. 3300.

[64] *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1565, 1568 (D.C. Cir. 1984).

[65] Young Depo. at 83-84 (prior controversy had been the subject of newspaper coverage "multiple times").

### E.     Young's Claim Is Barred Due To The Lack Of Actual Malice.

Even if the Court were to discard all of the statutory and common law defenses outlined above, Young's claim *still* fails due to the lack of any direct or circumstantial evidence of actual malice.

Actual malice is defined as "publishing a statement with knowledge that it was false or with reckless disregard of whether it was false or not."[66]  Reckless disregard for whether a statement is false requires that the publisher of the statement subjectively possess a "high degree of awareness … of probable falsity"[67] or when the publisher "in fact, entertained serious doubts as to the truth of [its] publication."[68]  The Sixth Circuit has held that absence of malice findings may properly serve as the basis for summary judgment findings:

> This case suggests that courts must be cautious about letting libel cases go to the jury under the malice standard where there is no proof that the reporter or his [or her] newspaper knew or suspected that the statements in his [or her] article were false. *"If the circumstances relied on as showing malice are as consistent with its non-existence as with its existence, the plaintiff has not overcome the presumption of good faith and there is nothing for the jury."*[69]

That Young's claim must be subjected to the actual malice standard is beyond argument. For purposes of a defamation claim, police officers are *per se* considered public figures.[70]  Thus, when an alleged defamatory statement might reflect on the police officer's performance or fitness for office, the police officer must prove that the false statement was made with actual

---

[66]     *Scott v. News Herald* (1986), 25 Ohio St.3d 243, 496 N.E.2d 699, 704 (quoting *New York Times Co., supra, at 279*); *see also Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609.

[67]     *Harte-Hanks Communications, Inc. v. Connaughton* (1989), 491 U.S. 657, 688, 109 S.Ct. 2678; *Garrison v. Louisiana* (1964), *379* U.S. 64, 74, 85 S.Ct. 209.

[68]     *St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 88 S.Ct. 1323.

[69]     *Orr v. Argus-Press Co.* (6th Cir. 1978), 586 F.2d 1108, 1112 (quoting *Raymond v. Croll* (1925), 233 Mich. 268, 275-75, 206 N.W. 556, 558).

[70]     *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710; *Henry v. Pearson* (1965), 380 U.S. 356, 85 S.Ct. 992; *St. Amant v. Thompson* (1968), 390 U.S. 727, 88 S.Ct. 1323; and *Soke v. Plain Dealer* (1994), 69 Ohio St.3d 395, 397, 632 N.E.2d 1282.

malice.[71]  Ohio courts have uniformly found that his kind of unfettered public scrutiny comes with the job. [72]

Accordingly, Young must demonstrate by clear and convincing evidence that Gannett employees had a "high awareness … of the probable falsity" of their story and "entertained serious doubts as to the truth" of the information. Not only does Young lack clear and convincing evidence of such "awareness" and "doubts," he lacks *any* evidence of actual malice whatsoever.

Young readily admitted that he possessed no such evidence in his sworn deposition testimony.  The pertinent portions are reproduced below, with his counsel's objections deleted:

> Q: Assuming that the reporter and the editor looked at these [public] documents, would they have had any reason to doubt their veracity?
>
> [YOUNG}: I can't speak to what Gannett News employees know when they read something.
>
> Q: Do you have any evidence that either the editor or the reporter doubted what they wrote when it went to press?
>
> [YOUNG]: No.
>
> Q: Okay. Do you have any evidence that they, I guess, engaged in a deliberate effort to avoid the truth about these allegations?
>
> [YOUNG]: No.[73]

---

[71]    *Garrison v. Louisiana* (1964), *379* U.S. 64, 74, 85 S.Ct. 209.

[72]    *Perez v. Scripps-Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 215, 520 N.E.2d 198 (""report of a charge against a public official may work an unfairness to that person," but "fairness of the broadcast is not at issue in [a defamation] suit … if the suggestion of criminality is a reasonable inference from something a public official has said or done, the media may draw that inference, [because] [s]uch is the First Amendment's contribution to free, open and honest government"); *see also Mueller v. Storer Communications*, 46 Ohio App.3d 57, 545 N.E.2d 1317 (1988)(holding that police officers are public figures and that the actual malice standard applies to their defamation claims).

[73]    Young Depo. at 73-75.

The materials exchanged in discovery support Young's frank responses. No evidence has been proffered that Herron in any way doubted the veracity of the documents she reviewed or the accuracy of the conclusion she extracted from them. Absent such evidence, Young cannot establish actual malice.

The concept of actual malice runs through all of the common law and statutory privileges and defenses outlined above. Otherwise, media outlets could be litigated into submission and the activities of public officials would never be subject to free and frank public discussion.[74] Young seeks to invoke precisely such a chilling effect here.

The ongoing coverage of Young's legal imbroglios must certainly be unpleasant for him on a personal level. But he accepts a public paycheck, and wears the uniform of a large municipality. Consequently, he is a public figure. In order to prevail here, as a matter of law he must establish actual malice on Gannett's part. As he admits that he possesses no such evidence, this Court has no choice but to award summary judgment.

## V.  <u>CONCLUSION</u>

On May 26, 2010, the *Advertiser* editor encountered a common journalistic dilemma. Faced with a large public record, she adduced a concise, impartial and accurate report. Relying upon the internal affairs finding, the victim's polygraph and the subsequent arbitration and court decisions which appeared to assume that consensual sex had occurred between Young and his accuser, the editor wrote the straightforward account published in the final story.

The story is both privileged by Ohio statute and protected by numerous common law First Amendment doctrines. And, perhaps most compellingly, Young has admitted that he has no evidence of actual malice. Accordingly, his Complaint is more than ripe for summary judgment.

---

[74] *New York Times Co.*, *supra*, at 271.

Respectfully submitted,

*Of Counsel:*

/s/ John C. Greiner

**John C. Greiner** (0005551)
**Steven P. Goodin** (0071713)
*Attorneys for The Cincinnati Enquirer*
GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH  45202-3157
Direct:   (513) 629-2734
Fax:       (513) 651-3836
E-Mail:  jgreiner@graydon.com
              sgoodin@graydon.com

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH  45202-3157
Phone:  (513) 621-6464
Fax:       (513) 651-3836

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of June, 2011, I electronically filed the foregoing *DEFENDANT'S MOTION FOR SUMMARY JUDGMENT* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record.

/s/ John C. Greiner

**John C. Greiner** (0005551)

3204015.1